UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CARDEW, HARRELL BONNER, PHILIP NELSON, MELVIN JOHNSON, and KHALIK JONES, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>-against-<br><br>NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION; ANTHONY J. ANNUCCI, in his official capacity as Acting Commissioner of New York Department of Corrections and Community Supervision; AMY LAMANNA, in her official capacity as Superintendent of Five Points Correctional Facility,<br><br>                Defendants. | No. 21-cv-6557<br><br>**COMPLAINT**<br><br>CLASS ACTION |

## INTRODUCTION

1.      This civil rights lawsuit challenges New York State Department of Corrections and Community Supervision's ("DOCCS"), Anthony J. Annucci's, and Amy LaManna's (collectively, "Defendants") systemic and discriminatory failure to provide people with mobility-related disabilities who are incarcerated at Five Points Correctional Facility ("Five Points") reasonable accommodations they need to access the facility's programs and services.

2.      Within its statewide system of correctional facilities, DOCCS directs some people in its custody with mobility-related disabilities to Five Points under the false premise that Five Points' status as a so-called "flat facility," with fewer stairs than other facilities, is alone sufficient to meet their needs. As a result, Five Points typically houses more than a hundred people who are elderly or have disabilities that affect their mobility, such as people who use wheelchairs, or people with chronic health conditions or pulmonary or heart conditions.

3.      Nevertheless, DOCCS fails to ensure people with disabilities who need reasonable accommodations are properly identified and accommodated once they arrive at Five Points. Even when DOCCS provided accommodations for people at other facilities, DOCCS fails to adequately track and ensure continuity of accommodations for them across its system, from facility to facility.

4.      DOCCS arbitrarily and without justification denies people at Five Points with disabilities necessary wheelchairs, crutches, canes, and other mobility aids that they need to safely move around the facility.

5.      When people with disabilities arrive at Five Points, the mobility aids they arrived with are often confiscated before even meeting with or being examined by a medical provider. In many cases, the confiscated mobility aids were provided by DOCCS officials and providers at another facility.

6.      People with disabilities at Five Points can go months or even years without necessary mobility aids, despite numerous petitions and grievances, in some cases aggravating their medical conditions and causing significant pain, and dramatically limiting and sometimes outright excluding them from programs and services at Five Points.

7.      Even when people with disabilities at Five Points are approved by DOCCS for use of mobility aids, DOCCS often arbitrarily and without justification denies them use of those aids while they are inside their cells. Frequently, they are given a permit for a wheelchair for "long distances only" and not given their own wheelchair or one properly fitted for them and their needs.

8.      Instead, people with disabilities at Five Points who are approved by DOCCS to use wheelchairs for "long distances only" must typically first retrieve, on their own, a wheelchair

from a shared "bank." The shared wheelchair bank might be located at considerable distance from their cell. This DOCCS policy effectively denies these people wheelchair access for anything but longer distance travel within the facility, and excludes from Five Points programs and services people who move too slowly to reach, or fear injury attempting to reach, the shared wheelchair banks on their own.

9.      Further, DOCCS does not individualize its accommodations when it provides mobility aids. DOCCS fails to provide individually fitted wheelchairs to people with disabilities, such that a very tall or large person could be forced to use a very small chair, or a very frail person could be forced to use an oversized chair. These wheelchairs are in extremely poor condition, are often nonfunctional, go missing, are vandalized on a regular basis, and are left for months and years without repair and maintenance.

10.     Plaintiffs and class members who use wheelchairs but cannot push themselves are denied self-powered motorized wheelchairs. Instead, they are provided manual wheelchairs that someone else must push for them and forced to depend on Five Points' deficient Inmate Mobility Assistant ("IMA") program (commonly referred to as the "pusher program") to get from place to place. Under the pusher program, Five Points designates certain people incarcerated to act as wheelchair "pushers" as a work assignment. Pushers are not specifically assigned to particular individuals with disabilities; instead a general call for pushers is made when needed.

11.     Because, on the vast majority of occasions, no pushers are available when called, Plaintiffs and class members are often left waiting, regularly 20-45 minutes, to be pushed to or from routine facility services and programs including meals, programming, religious services, legal calls, medical and mental health appointments, other call-outs, work, and the law library.

They are often stranded at these programs or call-out locations with no timely or safe way to go to other programs and services or return to their cells.

12.     They must then either attempt to push themselves, which is painful and risks injury and medical complications, pay other incarcerated people to push them, depend on the kindness of other (unpaid, untrained, and unassigned) incarcerated people to help them access services and programs, or else miss them altogether. Five Points' ineffective pusher program denies Plaintiffs and class members safe and consistent access to programs, services, and activities, such as meals and medical appointments. By requiring them to depend on third parties in this way, it also denies them independence and self-sufficiency.

13.     The lack of pushers, as well as the completely inadequate prerequisites to fulfill that job, are so severe that sometimes people with disabilities who need pushers themselves are assigned to be pushers for others.

14.     Defendants also routinely fail to provide cell assistants necessary to enable people with disabilities to perform activities of daily living within their cell, such as getting into and out of bed, making their bed, getting dressed, putting on socks and shoes, or cell cleaning. When cell assistants are assigned, they frequently are not screened, trained, or supervised, and some have used their position to exploit and abuse the people with disabilities they are supposed to assist.

15.     Plaintiffs, who are five men who use wheelchairs and canes, challenge Defendants' systemic failures to provide necessary accommodations, which have excluded each of them from programs and services such as meals, medical services, legal calls, recreation, and the law library in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

16.     Plaintiffs seek declaratory and injunctive relief on behalf of themselves and on behalf of a class of similarly situated individuals. The named Plaintiffs also seek compensatory damages for themselves for the injuries and harm they have suffered as a result of this discrimination.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504.

18.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District. Five Points is located in this district and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

19.     Plaintiff Robert Cardew is 62 years old and has been incarcerated at Five Points since September 2018. He has diabetes, a hearing impairment, hypertension, osteoarthritis, and cardiomyopathy. His cardiomyopathy caused him to receive a pacemaker in 2012, aortic valve replacement and bypass surgery in 2017, and limits his mobility. Mr. Cardew uses a wheelchair.

20.      Mr. Cardew is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). Mr. Cardew is unnecessarily excluded from Five Points' programs and services because of Defendants' failure to provide reasonable accommodations to people with disabilities, and he will continue to be excluded absent court intervention.

21.     Plaintiff Harrell Bonner is 68 years old and has been incarcerated at Five Points for more than ten years.  He has diabetes, neuropathy, asthma, hypertension, osteoarthritis, and scoliosis.  Mr. Bonner had a stroke in July 2012.  He has limited mobility and cannot use his left arm. He uses a wheelchair.

22.     Mr. Bonner is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). Mr. Bonner is unnecessarily excluded from Five Points' programs and services because of Defendants' failure to provide reasonable accommodations to people with disabilities, and he will continue to be excluded absent court intervention.

23.     Plaintiff Philip Nelson is 53 years old and has been incarcerated at Five Points for more than six years. He has severe chronic obstructive pulmonary disease (COPD), hypertension, and asthma. After an incident with his lungs collapsing and a subsequent blood clot, and also due to compound fractures in his back, he has limited mobility and uses both a cane and a wheelchair.

24.     Mr. Nelson is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). Mr. Nelson is unnecessarily excluded from Five Points' programs and services because of Defendants' failure to provide reasonable accommodations to people with disabilities, and he will continue to be excluded absent court intervention.

25.     Plaintiff Melvin Johnson is 59 years old and has been incarcerated at Five Points since May 2019. He has paraplegia and COPD, chronic bronchitis, and hypertension. He is a survivor of colon cancer, for which he has undergone eleven abdominal surgeries and six colon resections resulting in him having no colon. In 2020 he underwent surgery to repair a hernia and has since had further abdominal repair surgery. He uses a wheelchair.

26.     Mr. Johnson is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). Mr. Johnson is unnecessarily excluded from Five Points' programs and services because of Defendants' failure to provide reasonable accommodations to people with disabilities, and he will continue to be excluded absent court intervention.

27.     Plaintiff Khalik Jones is 39 years old and has been incarcerated at Five Points since December 2018. Mr. Jones has asthma, degenerative lumbar spine disease, low back pain radiating to lower bilateral extremities, carpal tunnel, chronic neuropathy in his right arm and wrist, and a seizure disorder. Mr. Jones also has speech and hearing disabilities. Mr. Jones requires a cane to safely get to programs and activities and move around within his cell.

28.     Mr. Jones is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). Mr. Jones is unnecessarily excluded from Five Points' programs and services because of Defendants' failure to provide reasonable accommodations to people with disabilities, and he will continue to be excluded absent court intervention.

29.     Five Points is owned, operated, and/or controlled by DOCCS.

30.     Defendant DOCCS is a New York state agency located in Albany, New York.

31.     Defendant Anthony J. Annucci is Acting Commissioner of DOCCS and is sued in his official capacity.

32.     In his capacity as Acting Commissioner, Defendant Annucci is the Chief Executive Officer of DOCCS and is charged with the overall responsibility for the proper and lawful administration of all facilities and programs within the jurisdiction of DOCCS, including the actions and conduct of those officers, agents, and/or employees who are employed by DOCCS.

33.     Defendant Annucci has the authority to promulgate, amend, and enforce rules and regulations governing the administration of all facilities and programs within the jurisdiction of DOCCS.

34.     Defendant Amy LaManna is Superintendent of Five Points and is sued in her official capacity.

35.     Subject to the direction of Defendant Annucci, Defendant LaManna is the Chief Administrative Officer of Five Points Correctional Facility. Defendant LaManna is legally responsible, under the laws of the State of New York, for the management and supervision of the facility and for directing the work and defining the responsibilities of all the employees of the facility.

36.     As the Superintendent of Five Points Correctional Facility, Defendant LaManna is the legal custodian of the Named Plaintiffs and members of the putative plaintiff class.

## FACTUAL ALLEGATIONS

**I.      The Five Points Facility**

37.     Five Points is a maximum security facility located in Romulus, New York owned and operated by DOCCS. It has capacity for as many as 1,500 people, but currently, Five Points houses approximately 1,000 people.

38.     Five Points has five housing units or "blocks." Meals are provided in a communal eating space known as the "mess hall" or "chow." The facility also provides educational and vocational programs, religious programs, and a law library, among others.

39.     For recreation, Five Points has a gym, weight room, large main yard, and a smaller block yard for each housing unit.

40.     Five Points typically houses approximately 50-60 people who require wheelchairs, walkers, or other mobility aids.

**II.     Defendants Fail to Identify and Accommodate the Disability-Related Needs of Plaintiffs and the Plaintiff Class, And Even Revoke Existing Accommodations.**

41.     As a matter of policy and practice, DOCCS fails to identify, track, and provide reasonable accommodations to people with disabilities before they arrive at Five Points to ensure continuity of accommodations.

42.     People who use mobility aids such as wheelchairs and canes often arrive at Five Points with those aids because they were issued at another DOCCS facility, in county jail, or before they were incarcerated.

43.     Yet people with disabilities often have their mobility aids confiscated at Five Points, and are told that they cannot request the return of their mobility aids until they meet with a primary care provider with the authority to provide disability-related accommodations. This is a blanket practice that does not consider the present individual needs of the person or their disability, nor their history of any prior accommodations.

44.     Defendants routinely fail to ensure that individuals meet with a primary care provider upon arrival at Five Points. As a result, people with disabilities who need mobility aids are left without them, making it difficult or impossible for them to move about the facility and causing pain, dangerous falls, pressure sores, and complications of underlying medical conditions.

45.     In order to meet with the primary care provider after arrival at Five Points, individuals with disabilities must request a visit as part of the "sick call" request process, which can take weeks or months, delaying the provision of necessary mobility accommodations.

46.     Even if they are seen at "sick call," they generally do not see their primary care provider, but rather they are triaged by another member of the medical staff without authority to provide disability-related accommodations.

47.     Without their mobility aids, people with disabilities at Five Points are unable to get to meals, recreation, the law library, phone privileges, jobs and educational programs, and other programming available to non-disabled people incarcerated at Five Points.

48.     Defendants routinely deny other accommodations related to people's mobility-related needs, such as wrist braces, wheelchair cushions, permission to use the elevator or bottom bunk, and restrictions on lifting and carrying objects.

49.     Defendants also consistently fail to make reasonable modifications to policies and practices to accommodate people with disabilities and allow them to access Five Points programs. For example, in March 2019, Defendants promulgated a yard policy that requires all people using the yard to immediately get on the ground in the event of an incident in the yard and provides no accommodations or exceptions based on disability.

50.     As a result, people with disabilities are fearful of utilizing recreation because they could be disciplined for failing to perform an action they cannot safely accomplish.

51.     The lack of appropriate mobility aids and related accommodations can cause pain, physical injuries, and aggravation or complication of underlying medical conditions.

52.     Upon information and belief, DOCCS has no policy ensuring continuity of accommodations and services for people with disabilities across DOCCS facilities and in conjunction with transfers, including transfers to Five Points.

III.    **Defendants Routinely Deny and Fail to Provide Necessary Mobility Aids and Cell Assistants to Plaintiffs and the Plaintiff Class.**

    A.  *Defendants Often Provide No Accommodation Whatsoever or Force Plaintiffs to Wait for Months, or Even Years, for Necessary Accommodations.*

53.     Five Points' medical providers routinely deny and fail to provide necessary mobility aids to people with disabilities who request them.

54.     Without any medical basis, DOCCS medical staff routinely ignores or denies requests for reasonable accommodation.

55.     Even when DOCCS medical staff approves reasonable accommodations for people with disabilities, corrections staff routinely and arbitrarily deny, ignore, and confiscate those accommodations.

56.     DOCCS staff routinely ignores or denies grievances from persons with disabilities that challenge Five Points' failure to accommodate their disability-related needs without any medical basis.

57.     People with disabilities wait as long as two years to receive access to wheelchairs, canes, and other mobility aids that are essential to accessing programming at Five Points. Without their mobility aids, people with disabilities at Five Points are unable to get to meals, recreation, the law library, phone privileges, jobs and educational programs, and other services and activities available to non-disabled people incarcerated at Five Points.

B.     *When Plaintiffs Do Receive Mobility Aids, Defendants Still Deny Them Use of the Aids Inside Cells, Forcing Them to Travel Unaided to Reach the Mobility Aids.*

58.     Even when DOCCS approves mobility aid accommodations for people with disabilities at Five Points, that approval is often limited to permission to access wheelchairs from a shared bank located at considerable distance from the person's cell and only to use the wheelchairs for long distances.

59.     DOCCS therefore requires most wheelchair users at Five Points to regularly navigate their cells and cellblocks without the use of wheelchairs, imperiling their safety, causing pain, and risking aggravation of medical conditions, while subjecting them to personal indignities.

60.     People with disabilities reasonably fear injuring themselves while traveling unaided to the shared wheelchair banks, often a slow or painful journey in the opposite direction of their destination. As a result, before deciding whether to access a Five Points program or

service, wheelchair users at Five Points must weigh the time and safety risk required to get to the wheelchair bank without assistance, a burden not faced by non-disabled people incarcerated at Five Points.

61.     In many cases, there are not enough shared wheelchairs for all those who require mobility assistance. For example, Nine Block has seven men who need wheelchairs, and yet the block has only a single chair they must share.

62.     By not providing sufficiently effective and adequate mobility accommodations, Defendants fail to ensure people with disabilities have meaningful access to DOCCS' facility and programs.

   C.   *When Plaintiffs Do Receive Mobility Aids, They Are Not Individualized to the Person's Disability-Related Needs and Are in Acute Disrepair.*

63.     When DOCCS does grant specific accommodations for use of wheelchairs or other mobility aids, Defendants do not properly assess individual needs or ensure the accommodation provided is properly tailored to the person's disability-related needs. Additionally, these aids are poorly maintained and frequently in acute disrepair.

64.     Wheelchair users must have access to wheelchairs that fit their bodies and accommodate their specific disability-related needs. Without properly fitted aids, people with disabilities can experience discomfort, pain, and complications of their disabling conditions.

65.     People with disabilities wait months or years to receive properly fitted wheelchairs that are essential to their safety, comfort, and health. Without appropriately fitted wheelchairs that accommodate their individual needs, people with disabilities are unable to safely navigate the facility and, in practice, are excluded from programs and services like meals, recreation, jobs, call outs, and the law library.

D. *Defendants Routinely Fail to Assign Cell Assistants to People with Mobility Disabilities Who Cannot Perform Activities of Daily Living.*

66.     In the DOCCS system, cell assistants are incarcerated persons who have been assigned to assist people with mobility disabilities in activities of daily living.

67.     Cell assistants perform duties such as assisting a person with a disability in cleaning their cell, getting into and out of bed, transferring into and out of a wheelchair, making their bed, getting dressed, putting on socks and shoes, or alerting correction officers if there is a medical emergency.

68.     Requests by people with disabilities for cell assistants frequently go unfilled for months or even years, and even when assigned, are not properly administered, leaving long gaps when no cell assistant is available or provided. People with disabilities are thus not accommodated in their day-to-day needs to access programs, services, and activities, such as meals, showers, the law library, recreation, jobs, and other programs that require people to be cleanly and neatly dressed and showered. Additionally, people with disabilities can be disciplined for failing to clean their cell, or physically harmed by tripping or falling in their cell if they are unable to tidy and remove garbage.

69.     Cell assistants are supposed to meet the same minimum qualifications as IMA pushers: a high school diploma, sensitivity to the needs of people with disabilities, and completion of an orientation and training program. They must have no history of discipline or violence for the prior six months and no history of extortion for the previous year.

70.     As a matter of practice, however, DOCCS fails to properly screen, train, and supervise cell assistants at Five Points. Though cell assistants are paid by the facility, some demand additional compensation from the person with disabilities, and some have used their positions to exploit and abuse the people with disabilities they are supposed to assist.

**IV.     The Inmate Mobility Assistant Program Fails to Provide Necessary Reasonable Accommodations to Plaintiffs and the Plaintiff Class.**

71.     For people at Five Points whose disabilities make it difficult or impossible for them to push their own wheelchair, DOCCS manages and operates the IMA program, which employs people incarcerated at Five Points as pushers.

72.     To qualify to use the pusher program, a person with a disability requires a permit from Five Points' medical unit granting the accommodation.

*A.     Wheelchair Pushers Are Not Available When Needed.*

73.     A pusher is not assigned to assist a specific individual with a disability on an ongoing basis. Rather, pushers are assigned on an ad hoc basis each time an individual with a disability requests mobility assistance.

74.     When a person with a pusher permit needs to travel to or from programs or services, such as meals, the law library, call-outs, or recreation, the practice at Five Points is that the person with the disability must walk unaided or push themselves from their cell to the correction officer's desk and request a pusher, which can cause pain or aggravate underlying medical conditions.

75.     The correction officer then requests—usually by shouting or announcement—a pusher to assist the person with the disability. In the meantime, the requestor, who requires a wheelchair because of his inability to walk, must wait at the correction officer's desk for a pusher to arrive. These waits are often as long as 20-45 minutes.

76.     Sometimes, no pusher is available at all, and either another person incarcerated at Five Points—not trained as a pusher or compensated through the IMA program—will be conscripted by staff to push the individual, the requestor will ask someone they know to push

14

them either for pay or as a courtesy, or the requestor will attempt to push themselves—even though doing so is dangerous or painful.

77.     Due to the long delays in being provided a pusher and frequency with which pushers simply do not show up or are not assigned, people with disabilities at Five Points miss meals, recreation, call-outs, use of the law library, and other programs and services that the facility offers and, in many cases, requires.

78.     Even when a pusher is available, the person being pushed is often abandoned as soon as they get to their destination. If that person needs to use the restroom, needs to get through a heavy door or up or down steps, or wants to move at all before the program is over, they again need to depend on other incarcerated people they pay themselves or on unpaid volunteers to take them from place to place, including returning to their cell.

79.     The IMA program is so inadequate that Plaintiffs frequently risk physical injury when going back and forth to the wheelchair bank or officer's desk to request a pusher, waiting for a pusher, or resorting to pushing or dragging themselves.

> B.  *The Pusher Program Forces People with Disabilities to Rely on Untrained and Frequently Unpaid Peers, Which Denies People with Disabilities Their Independence.*

80.     Relying on pushers and paid/unpaid volunteers also leaves people with disabilities at Five Points dependent on others to access basic programs and services, from meals to call-outs. This reliance also forces people with disabilities to depend on others for basic hygiene, such as getting to and from the bathroom. Forcing people with disabilities to depend on others to satisfy basic needs denies them the independence and self-sufficiency that non-disabled people enjoy.

81.     Non-IMA pushers sometimes push the people who depend on them into walls or doors, attempt to use their chairs to secret contraband, or demand money or goods to push them

or return their personal belongings. This puts people with disabilities at risk of abuse, damage to their chairs, and significant disciplinary sanctions.

### C. The Pusher Program Employs Plainly Unqualified People to Be Pushers.

82.     Pushers who participate in the IMA program are required, by policy, to pass a medical evaluation and be trained to assist people with disabilities in transferring to and from the chair, ensuring proper attire for weather conditions, assisting with meals, and assisting with lifting and transport.

83.     Yet Five Points rarely, if ever, enforces these requirements, and the pushers receive essentially no training on working with or assisting people with disabilities.

84.     For example, Plaintiff Philip Nelson is a cane and wheelchair user who has compound fractures in his back as well as high blood pressure, and has fallen on multiple occasions because of his inability to stand and walk. He frequently has dizzy spells, falls five or six times a month because he has been provided only a cane and inconsistent access to a wheelchair, and once broke his nose from a fall. He has an outstanding request to DOCCS medical to be assigned a pusher to assist him as he cannot safely stand and walk for any time but short periods. Nevertheless, Mr. Nelson was assigned to be a pusher for approximately three years, and faced discipline when he was physically unable to serve as a pusher.

85.     Even for those pushers physically able to push others, some have taken advantage of the position to exploit people with disabilities by forcing them to pay to be pushed, or by using their chairs as a vehicle for contraband.

## NAMED PLAINTIFF ALLEGATIONS

### A. Plaintiff Robert Cardew

86.     Mr. Cardew's cardiomyopathy causes chest pain and dizziness when he stands, walks, or otherwise exerts himself. In 2012, Mr. Cardew received a pacemaker, and in 2017

underwent coronary bypass surgery and aortic valve replacement. Mr. Cardew began using a wheelchair in September 2018. He cannot push, pull, or lift more than ten pounds, and this means he cannot safely push himself in his wheelchair.

87.     Mr. Cardew has been repeatedly denied permission to keep his wheelchair in his cell, including during the entire period from September 2018 to December 2019. He continues to be threatened with the denial of permission for cell access to his wheelchair. For example, in December 2019, and as recently as in April 2021, Mr. Cardew was arbitrarily ordered to remove his wheelchair from his cell despite being previously informed he should keep the wheelchair with him.

88.     When Mr. Cardew is denied permission to keep his wheelchair in his cell, he must store it in the shared wheelchair bank, where it is subject to loss or vandalism. A wheelchair that Mr. Cardew previously used was permanently damaged while being stored in the wheelchair bank, and on occasions he found it with parts stolen or the frame bent. When he complained, correction officers told him it was not their responsibility to prevent such damage. Still other times, the chair was missing when he needed it, being used by other prisoners, or unsanitary from others' use. When forced to leave his wheelchair in the shared bank, Mr. Cardew fears that others will store contraband on the chair, exposing him to disciplinary action when he resumes using it.

89.     When Mr. Cardew is denied permission to keep his wheelchair in his cell, he risks physical injury from falling while in his cell, walking unaided between his cell and the shared wheelchair bank, and standing to wait for a wheelchair at the bank. Mr. Cardew has fallen before while at Five Points.

90.     In a prior housing unit, Mr. Cardew's cell was located approximately 50 yards from the shared wheelchair bank. Sometimes Mr. Cardew would traverse this distance unaided to find that not only was his designated wheelchair unavailable, but no wheelchairs were available. Once when this happened, a correction officer told him he could either walk to the mess hall or not eat.

91.     Mr. Cardew's height is 6'5", but Five Points has never provided him with a properly sized wheelchair to fit his tall frame. Instead, he uses a wheelchair that is too small for him and has cracked and worn padding, protruding bolts, and bent leg rests from being rammed into doors and walls. The brake on the wheelchair is loose, making it unsafe. The unfitted chair is painful for Mr. Cardew to sit in. Because his legs are too long for the chair, his feet drag on the ground while moving. His only alternative is to set his feet on the wheelchair's bent foot rests, even though they cannot be extended sufficiently to fit his legs; this causes his knees to be elevated above his lap when seated, cramping his body uncomfortably.

92.     In response to a 2019 grievance Mr. Cardew submitted about this issue, the Inmate Grievance Review Committee stated: "Medical does not specifically 'fit and measure' a wheelchair to the inmates. The standard wheelchairs that are distributed to the inmates are brand new and the arms come with the wheelchairs so they would not be different sizes. If the inmate wants a chair to their bodies specific measurements it is their responsibility to order, pay for, and have the maintenance done on it."

93.     When Mr. Cardew is forced to push himself in a wheelchair, he experiences chest pains, shortness of breath, dizziness, and at times must take nitroglycerine for his heart condition. He cannot safely push himself in his wheelchair and requires assistance.

94.     Because Mr. Cardew cannot push himself in his wheelchair and has not been provided a motorized wheelchair to access programs and services independently, he relies on the IMA program to access Five Points' programs and services; however, because the IMA program is so deficient, Mr. Cardew frequently finds himself stranded without a pusher, and he regularly misses or is late arriving to or returning from programs.

95.     For example, most evenings, Mr. Cardew is delayed in eating because there is no IMA pusher ready to take him to his scheduled meal. For breakfast and lunch, Mr. Cardew usually relies on a friend to volunteer to push him because no IMA pushers are available. Mr. Cardew has also been regularly abandoned in the mess hall without a pusher to push him back to his housing unit. A correction officer told Mr. Cardew he should request a feed-in permit (to be fed in his cell and not in the mess hall, segregated from other people in the facility) so that he would stop needing to be pushed to and from the mess hall.

96.     As a recent example of Mr. Cardew's ongoing difficulty accessing meals due to the pusher program, Mr. Cardew was delayed traveling to or from the mess hall, or missed a meal entirely, six times within a one week in January 2021. He has been abandoned both in his cell and in the mess hall when officers were unable to secure a pusher, and on one of those occasions, an officer conscripted a non-pusher who himself uses a cane to push Mr. Cardew.

97.     On another occasion that week, Mr. Cardew was abandoned in his housing unit at breakfast because Five Points again failed to provide an IMA pusher to push him to the mess hall. When Mr. Cardew's company returned from the mess hall, he was still sitting in the housing unit waiting for a pusher. Correction officers then provided him with an IMA pusher to push him to the mess hall, but by that point the mess hall was closed, so Mr. Cardew was unable to eat.

98.     When Mr. Cardew visits the law library, he can wait up to half an hour alone in the passageway afterwards because no pusher shows up to bring him back to his cell.

99.     Similarly, Mr. Cardew has been forced to wait twenty to thirty minutes for a pusher to retrieve him from vocational programming. As one example, in February 2020, Mr. Cardew asked his vocational electrical instructor to obtain an IMA pusher to push him back to his housing unit. A call was made to Mr. Cardew's housing unit for a pusher, but none arrived. After half an hour, Mr. Cardew requested a pusher again. The correction officer called Mr. Cardew's housing unit for a pusher again. The correction officer then ordered Mr. Cardew to push himself from the vocational area into the main corridor and back towards his housing unit until he encountered the pusher coming to meet him from the housing unit.

100.     Mr. Cardew is excluded from recreation because there is generally no pusher available to take him to recreation or bring him back. Even if there is a pusher, Mr. Cardew cannot go to recreation because Defendants' March 2019 yard policy requires that he be able to immediately lie down on the ground if there is an incident in the yard. Mr. Cardew cannot safely get on the ground from his chair or get back up, and though he sought accommodation based on his disability, no modifications or exceptions to this policy were granted for him or other persons with a mobility disability.

101.     On each of these occasions, Defendants deny Mr. Cardew the self-sufficiency and independence that non-disabled people incarcerated at Five Points enjoy.

102.     Mr. Cardew was granted a cell assistant on December 6, 2018 by then-Acting Superintendent Amy Titus, but was not provided one until February 12, 2020. During that period, Mr. Cardew was alternately told by DOCCS personnel that the Superintendent had no authority to grant him a cell assistant and that Mr. Cardew was not authorized to receive a cell

20

assistant at all. Nevertheless, nine months after he was granted such an accommodation in August 2019, he was finally assigned a cell assistant—who was not even in the facility, as he had been paroled. His second assigned cell assistant never once assisted him in the three months that followed. In fact, Mr. Cardew never met either assigned cell assistant.

103.    In December 2019, Mr. Cardew ultimately recruited his own cell assistant he met through a program, but that cell assistant was never formally trained or processed even though Mr. Cardew's program card lists him as Mr. Cardew's cell assistant. Only six months later, on June 5, 2020, Mr. Cardew was informed that his cell assistant had been reassigned to be an IMA. When Mr. Cardew filed a grievance, the former cell assistant was reinstated to assist Mr. Cardew, but only through August 2020. Since then, Mr. Cardew has at times ostensibly been assigned other cell assistants, but only on paper; he has only actually received assistance once, when he needed assistance moving cells.

104.    During these extended periods of more than a year without an assigned cell assistant, Mr. Cardew is unable to clean his cell or wheelchair properly, and is at risk of falling and not being able to get back up from the floor. Additionally, Mr. Cardew reasonably fears he could experience a medical emergency, particularly in the middle of the night, rendering him unconscious or unable to call for help, with no one to assist him or alert authorities.

105.    Mr. Cardew repeatedly raises his lack of a cell assistant with Five Points staff to no avail. As recently as July 3, 2021, Mr. Cardew raised his lack of a cell assistant with correction officers, who informed him that the cell assistant program had been eliminated in his housing unit.

106.    Others have also informed Defendants of the failure to provide Mr. Cardew with the reasonable accommodations he needs. Mr. Cardew was one of several individuals highlighted

in a letter, dated August 3, 2020, from the CUNY School of Law Disability Justice and Aging Clinic notifying Defendants of "major deficiencies in disability related programming and reasonable accommodations at Five Points," including problems with the IMA program. The letter included 202 pages of supporting evidence. To date, the CUNY School of Law Disability Justice and Aging Clinic has received no substantive response, and the policies and practices precipitating the letter have not improved.

### B. Plaintiff Harrell Bonner

107.    Mr. Bonner has diabetes, neuropathy, asthma, hypertension, osteoarthritis, and scoliosis.  He also had a stroke in July 2012. Mr. Bonner has limited mobility. He cannot use his left arm, and he has a large cyst, neuropathy, and carpal tunnel syndrome in his right arm. Due to his disabilities, Mr. Bonner requires a wheelchair to navigate Five Points and cannot push his own wheelchair without significant pain.

108.    Mr. Bonner arrived at Five Points in early 2010 with a DOCCS-issued wheelchair that he had received in 2009 from another facility, which was fitted to his size and weight, had functional arm and leg rests, and was in good working condition. On arrival at Five Points, that fitted, functioning wheelchair was immediately confiscated and replaced with a wheelchair that was not sized to his body and was in poor condition, including having non-functional leg rests, preventing him from keeping his legs properly elevated to accommodate diabetes-related swelling in his lower legs.

109.    During his time at Five Points, Mr. Bonner has consistently been forced to use wheelchairs in poor and dangerous condition. In around November 2010, he injured his back in a fall caused when the hand grips of his wheelchair broke as he was getting out of bed. That wheelchair was replaced by another chair in poor condition.

110.    Over the years, Mr. Bonner has repeatedly requested a functional chair only to wait months for a replacement and eventually receive a replacement with similar problems to the old chair.

111.    For example, on or about May 4, 2015, Five Points issued Mr. Bonner a 24-inch-wide wheelchair, but no sooner had he signed a receipt for the wheelchair at the medical unit than he was forced to return it because it was too wide to fit through the door of his cell.  A few weeks later, on or about May 26, 2015, Five Points issued him a "new" 22-inch-wide wheelchair. But no sooner had he signed a receipt for that wheelchair than he was again forced to return it because, as medical staff noted: "[e]n route to return to block – [wheelchair] had parts falling off it!"

112.    As another example, on around October 9, 2019, Mr. Bonner received a replacement chair that he had been requesting for at least seven months, but the "new" chair was sent back to maintenance within days, on around October 17, 2019, because one of the wheels came off while Mr. Bonner was being pushed.

113.    From around October 17, 2019 until June 2020, Mr. Bonner was given a wheelchair to use from the shared wheelchair bank that was too small for his body size. The small chair was falling apart: it had a loose wheel and a ragged armrest, and Mr. Bonner was forced use a ripped T-shirt to tie the chair's arm to the chair's seat. It was not individualized for Mr. Bonner's specific needs, particularly given the chair's narrow width and short leg rests that were inappropriate for his tall frame and insufficient to accommodate diabetes-related swelling in his lower legs.

114.    He repeatedly grieved the need for a new chair but did not receive another replacement until June 2020, approximately eight months later. The replacement has many of the

same issues as his prior Five Points chairs, including brakes that have broken repeatedly, screws that stick up through the arm rest padding and scratch his arms, and missing leg rests. To try to mitigate his leg swelling, Mr. Bonner has again been forced to jerry-rig the chair himself by tying on the too-short leg rests from his "interim" chair to his current chair.

115.    Mr. Bonner also waited approximately a year to receive an air cushion ("Roho cushion") for the wheelchair seat, which he needs to avoid dangerous and painful pressure sores. Without the Roho cushion, Mr. Bonner relies on a makeshift cushion made out of a pillow to support him and has developed pressure sores as a result.

116.    Mr. Bonner's various disabilities mean that he cannot safely push himself in a wheelchair. When forced to push himself, he experiences chest pains and shortness of breath, and frequently requires nitroglycerin treatment to mitigate his pain. Since he has the use of only one arm, he is prone to push himself in circles. As a result, he typically attempts to move along the edges of a corridor to try to brace himself against the wall as he moves. Pushing himself also causes pain and swelling in his fingers. In addition, he bears the risk of urinating on himself when he is unable to reach a bathroom quickly on his own.

117.    Because he cannot safely push himself, Mr. Bonner relies on the IMA program to move about Five Points, but in practice he is unable to access many of the facility's programs. He experiences difficulty pushing himself to the correction officer's desk where he can request a pusher, endures very long waits for a pusher, and has been stranded places because a pusher could not be found.

118.    Mr. Bonner has not been consistently able to access the law library because he must find his own volunteer pusher.  He has missed legal phone calls because no IMA pusher was available.

119.    Mr. Bonner cannot access recreation because even if he is able to secure a pusher to get to recreation, the pusher does not stay to push him around or take him to the bathroom. When he has asked for a pusher to remain with him so he can play chess or cards and access the outside recreation area, as well as get to and from the restroom, he is told that no one can stay with him.

120.    On each of these occasions, Defendants deny Mr. Bonner the self-sufficiency and independence that non-disabled people incarcerated at Five Points enjoy.

121.    Because many of the pushers in the IMA program are not trained, Mr. Bonner has been pushed into doorways and walls, which is stressful and dangerous to him. The experience of attempting to secure a trained pusher has become so difficult and stressful he has stopped going to recreation.

122.    At various times when Mr. Bonner has complained or filed a grievance to address his lack of access to a trained and compensated IMA pusher, he has been assured that IMA pushers will be made available to him, yet Defendants have failed to remedy the systemic deficiencies in the pusher program. For instance, in February 2019, in response to a grievance by Mr. Bonner, the Inmate Grievance Resolution Committee recommended that Five Points' Superintendent issue a memorandum stating that only trained, paid wheelchair pushers may push wheelchair users. The Committee noted that after a prior grievance by Mr. Bonner on the same issue, a sergeant had directed the correction officers on Mr. Bonner's block to use only trained, paid pushers, but Mr. Bonner reported that the officers failed to follow the sergeant's order. The Committee's recommendation specifically stated:

> The paid wheelchair pushers (mobility assistants) sign a contract before being allowed to have a job as a mobility assistant. The contract that they sign states that they understand they are not supposed to run the inmates they are pushing into walls, or doors, etc. because it creates a liability issue. Also, the part of the contract

states that the mobility assistants are required to help wheelchair-bound inmates with other activities. . . . Finally any inmate who wishes to have a job as a mobility assistant is supposed to be placed on a call-out to the infirmary to watch a training video before they sign the mobility assistant contract. The video teaches the inmates how to use the wheelchair's foot pedals as guides when going through doorways, among other skills. This training would prevent the type of actions that the grievant is complaining about.

Nevertheless, Defendants have failed to address the Committee's recommendation.

### C. Plaintiff Philip Nelson

123.    Philip Nelson has very limited ability to stand and walk. He has poor balance, dizzy spells, shortness of breath, and blurry vision due to his disabilities and has fallen on multiple occasions when attempting to stand and walk. Mr. Nelson has significant breathing issues and requires breathing treatments at least once a week, usually due to coughing fits in the middle of the night, when he is unable to catch his breath.

124.    Due to his disabilities, Mr. Nelson requires a wheelchair to navigate Five Points and cannot push his own wheelchair without significant pain. However, though he was approved for a wheelchair more than six years ago in a previous facility, at Five Points he has generally been provided only a cane, which is insufficient to meet his disability-related needs.

125.    Defendants have denied Mr. Nelson's requests to keep a wheelchair in his cell and have only permitted him occasional use of a wheelchair for what they deem "long distances." Nevertheless, in practice, Mr. Nelson has been repeatedly denied the use of a wheelchair even for longer distances because correction officers routinely disregard his wheelchair permit. When a correction officer does honor his permit for wheelchair access, Mr. Nelson must rely on wheelchairs in the shared wheelchair bank to travel around the facility rather than a wheelchair specifically suited to his needs.

126.    Mr. Nelson experiences pain and risks physical injury from falling while in his cell and during the journey between his cell and the wheelchair bank. Defendants have currently

granted Mr. Nelson a medical permit for a cane; however, the cane insufficiently accommodates his limited mobility, and he falls while using a cane approximately 5-6 times a month. Around May 2019, he broke his nose from a fall in his cell. Mr. Nelson frequently has breathing issues when attempting to navigate the facility with only a cane, gasping for air and making frequent stops to lean against a wall and catch his breath.

127.    When Mr. Nelson leaves the facility for medical appointments, he is not provided a wheelchair and his legs are routinely shackled, further impeding his ability to walk and increasing his risk of a serious fall.

128.    Even when Mr. Nelson is able to reach the shared wheelchair bank, he often finds no wheelchairs available because there are not enough wheelchairs stored there for the number of people on the cell block who need them.

129.    Further, even when a wheelchair is available, it is often too large and heavy for his small frame; lacks appropriate arm, foot, and leg rests that he requires; and is not fitted to Mr. Nelson's individual needs. Many of the shared wheelchairs in the bank have broken bearings and are in poor condition, limiting their function.

130.    Since Mr. Nelson cannot push himself in a wheelchair, he uses the IMA program to access Five Points' programs and services. However, pushers are rarely available; he typically receives IMA assistance only about once a month.

131.    Mr. Nelson experiences long waits when needing a pusher from the IMA program and has missed meals, recreation, visits to the law library, phone calls, and call-outs as a result of the inadequacy of the pusher program. For example, during Module Four, from 7pm-10pm, every night when he would otherwise be able to go to the yard, the recreation room, or the law

library, there are no pushers. As a result, he is denied many services and programs because of the difficulty of securing a trained and compensated pusher.

132.   Mr. Nelson is unable to access recreation because of DOCCS' inflexible yard policy. Two years ago, Mr. Nelson was in the recreation yard when an incident occurred. Pursuant to Five Points policy, Mr. Nelson was forced to get himself down on the ground during the incident, despite his disabilities making it difficult, if not impossible, for him to do so safely.

133.   One trip Mr. Nelson cannot avoid is travel to the medical unit to treat his disabilities, including his at least weekly and sometimes more often nebulizer breathing treatments. Prior to the COVID-19 pandemic, Mr. Nelson had to visit Five Points' medical unit every day to be administered medication, and during the pandemic he still travels there for monthly appointments. Medical is far from his cell, on the other side of the facility, and the journey there requires travel up an incline. Mr. Nelson is rarely, if ever, provided with a pusher for the trip, forcing him to push himself, which aggravates his breathing and is slow, painful, and dangerous for him.

134.   On each of these occasions, Defendants deny Mr. Nelson the self-sufficiency and independence that non-disabled people incarcerated at Five Points enjoy.

135.   Often, Mr. Nelson is denied access to a wheelchair altogether, despite his permit to use one. This includes being denied a wheelchair for his trip to the medical unit, forcing him to traverse the length of the facility with only his cane.

136.   Mr. Nelson's day-to-day access to a wheelchair depends on the whims of the correction officers he encounters. Sometimes, correction officers will tell him "someone else needs" the only chair available in the wheelchair bank. Other times, correction officers will say they lack documentation of his need for a wheelchair. When he shows them the Five Points

medical permit he carries authorizing his use of a wheelchair for long distances, they have responded that the permit means nothing.

137.    As one example, in February 2021, Mr. Nelson was denied access to a wheelchair and pusher to get to the mess hall for breakfast and missed breakfast. When he complained to the officer about his pain moving around, he was told that if his pain continued, he should just stay in his cell.

138.    Recently, Defendants made the COVID-19 vaccine available to individuals at Five Points, but Mr. Nelson was told no pushers were available to take him to the vaccination site within the facility and that no wheelchairs were available. Mr. Nelson therefore walked with only a cane, laboriously and gasping for breath, to get to the vaccine. The journey took him approximately 20 minutes in each direction.

139.    Despite Mr. Nelson's significant medical needs, including his outstanding requests for a fitted wheelchair he can keep in his cell and a dedicated pusher, he has been assigned the job of IMA pusher while at Five Points. Until February 2021, for approximately three years, Mr. Nelson was regularly called to push, including a period from around September through December 2020 when he was called to push approximately every day. When called to push, Mr. Nelson would rely on the handles of the chair to support him as if they were a walker. On more than one occasion, he collapsed on the floor while working as a pusher, unable to breathe or continue pushing.

140.    In February 2021, Mr. Nelson experienced extreme difficulty breathing while working as a pusher, required breathing treatment immediately following the pushing assignment, and was unable to work as a pusher when called to push the following day. He received a misbehavior ticket for refusing his work assignment and served 72 hours in keeplock,

a form of discipline akin to solitary confinement. Mr. Nelson was subsequently informed that his job assignment as a pusher had ended.

141.    Mr. Nelson received no training to be a pusher in the IMA program, and his medical fitness to be pusher was never evaluated.

142.    Mr. Nelson also requires a cell assistant for cell cleaning and to alert authorities in case of medical emergencies, when he is unable to breath and speak. He was sporadically assigned cell assistants when he first arrived at Five Points, but never for long periods, and he did not have a cell assistant between July 2019 and mid-August 2021.

143.    In January 2021, Mr. Nelson was told to move cells but was unable to pack and move his belongings without a cell assistant. A correction officer eventually helped him move into the new cell, but the next day Mr. Nelson was told his new cell assignment was made in error and he had to move again—this time without any assistance. Mr. Nelson was unable to move his belongings without help and was disciplined with 72 hours of keeplock.

144.    Mr. Nelson seeks a cell assistant who has been properly trained, screened, and is compatible with his needs to assist with cell cleaning and moves.  Mr. Nelson reasonably fears physical, emotional, or sexual abuse from improperly screened and trained cell assistants.

145.    Additionally, Mr. Nelson reasonably fears he could experience a medical emergency, particularly in the middle of the night, rendering him unconscious or unable to call for help, with no one to assist him or alert authorities. Mr. Nelson has even identified someone willing to be trained and perform these duties, but his request has been denied.

### D.  *Plaintiff Melvin Johnson*

146.    Mr. Johnson's paraplegia, heart and bronchial conditions, and recent abdominal surgeries limit his mobility. Additionally, he has a longstanding shoulder injury. He has used a

wheelchair for approximately nine years. He cannot push, pull, or lift items of any weight, and cannot safely push himself in his wheelchair.

147.    Mr. Johnson's disabilities require the use of a wheelchair tailored to his body. Mr. Johnson requires a wheelchair to be tailored to accommodate his abdominal injuries and include appropriate supportive footrests to ensure that his weight is evenly positioned and balanced when in motion. An individualized wheelchair is necessary to alleviate stress on his back and lessen the danger of developing pressure sores and tipping when in motion.

148.    During his time at Five Points, Mr. Johnson has not been provided a wheelchair tailored to his body. Prior to arriving at Five Points, Mr. Johnson was incarcerated in the Regional Medical Unit at Wende Correctional Facility, where he was approved for an individualized wheelchair for his specific needs. But just as he was scheduled to be measured for the wheelchair at Wende, he was transferred to Five Points.

149.    Mr. Johnson has been waiting for his specialized wheelchair since his arrival at Five Points two years ago. He has raised the issue with Five Points medical staff repeatedly, but they have ignored his requests. When he grieved this issue, he was told there was no record of any request for a tailored wheelchair.

150.    Because Defendants have denied Mr. Johnson an individualized wheelchair that meets his needs, he instead must use an unfitted wheelchair that heightens his risk of developing dangerous and painful pressure sores, and he has developed sores while at Five Points. Without a wheelchair that has the foot rest he needs, one of Mr. Johnson's feet constantly slides off the foot pegs; this has caused his foot to be run over multiple times.  Additionally, one of the arm rests on his chair is loose.

151.    Significantly, one of the wheels on his chair is taller and narrower than the other, making the wheelchair unstable and difficult to push. The reason the wheels on Mr. Johnson's chair are not the same size is that in around June 2021, one of the wheelchair's original wheels broke and fell off while Mr. Johnson was using it. He was left in that broken chair the rest of the day, forced to physically hold the wheel to the chair to keep upright. The next day, he was given a temporary chair—also difficult to push because it had a seat far too wide for him—which he used while the chair with the broken wheel was purportedly repaired by Five Points' maintenance department. But Defendants' wheelchair "repair" consisted of replacing the broken wheel with a smaller, wider wheel that did not match the existing one. The chair's misbalanced wheels make it virtually impossible to push the wheelchair on uneven or slippery ground, preventing Mr. Johnson from using his cell's outdoor pen as often as he would otherwise.

152.    Since Mr. Johnson cannot safely push himself in his wheelchair, he relies on the IMA program to access Five Points' programs and services. However, because the IMA program is so defective Mr. Johnson frequently finds himself stranded without a pusher. Indeed, Mr. Johnson is rarely assigned an IMA pusher for the trips he requires. Instead, correction officers either conscript non-IMA pushers to push him where he is going on an ad hoc basis, make him find his own a non-IMA volunteer willing to help him, or force him to push himself, even though it is dangerous and painful for him to do so.

153.    Mr. Johnson has been repeatedly subjected to untrained pushers who damage his chair and endanger him. Such informal pushers have pushed Mr. Johnson into doors and walls, injuring him and breaking his chair. Indeed, what precipitated the wheel of his chair falling off in June 2021, was an untrained pusher racing with his chair and slamming one side while coming around a corner.

154.     Mr. Johnson's constant need for informal assistance with his mobility disability puts him at risk of exploitation from his peers. Nevertheless, he usually relies on a volunteer, that he secures for himself, to push him to the law library every day because no IMA pushers are available at that time. He has also been forced to find volunteers to push him to legal phone calls.

155.     On each of these occasions, Defendants deny Mr. Johnson the self-sufficiency and independence that non-disabled people incarcerated at Five Points enjoy.

156.     With respect to recreation, Mr. Johnson's former cell pen overlooked the recreation yard, where he observed people in wheelchairs being ordered on the ground during fights or other incidents and then struggling to get back up off the ground.

157.     Almost every day, Five Points fails to make an IMA pusher available to Mr. Johnson for his morning trip to the medical unit to receive dressing care for his abdominal surgery incision. Even though Mr. Johnson is scheduled for routine medical service, correction staff not only fail to have an IMA pusher ready for him, but generally refuse to call an IMA pusher for him at all, despite his specific requests for one.  Instead, correction officers direct any untrained and uncompensated individual who also happens to have a medical call-out that morning to push Mr. Johnson to the medical unit. Often, these conscripted individuals push Mr. Johnson into doors or walls, or abandon him before his destination.

158.     Since Mr. Johnson's regular appointment is relatively quick, he typically finishes at the medical unit long before anyone else, leaving him without anyone to push him back to his housing unit. When Mr. Johnson has requested an IMA pusher be called to the medical unit to take him back to his housing unit, he has been told the wait would be 45 minutes to an hour. As a result, Mr. Johnson experiences pain and frequently risks serious injury by pushing himself back to his housing unit, a distance of at least a quarter of a mile.  It takes him approximately twenty

minutes to push himself back to his housing unit every day, and doing so exacerbates his shoulder injury.

159.    Mr. Johnson recently received the COVID-19 vaccine but was not provided a pusher to get to the area where the vaccines were being administered. Mr. Johnson had to push himself to and from the vaccination site, despite his shoulder injury and the significant pain he endured.

160.    Once Mr. Johnson pushes himself back to his housing unit, he must endure additional wait times—not faced by non-disabled people incarcerated at Five Points—of between five and twenty minutes to take the elevator to his second-floor cell, because Five Points has denied his requests for a ground-floor cell.

161.    Beyond increasing Mr. Johnson's travel time anywhere in the facility, thus delaying and decreasing his overall time for accessing Five Points programs, Five Points' failure to accommodate Mr. Johnson with a ground-floor cell has denied him access to many other programs and services.  For example, in around February 2020, the elevator in his housing unit went out of service while Mr. Johnson was attending a program. To reach his cell, Five Points staff forced Mr. Johnson to drag himself up the stairs on his rear, while other incarcerated individuals carried his wheelchair up the stairs. Five Points then isolated Mr. Johnson in his cell for approximately five days, without access to any programs or call-outs, while the elevator was repaired. More recently in March 2021, he missed his wound care appointment due to another elevator outage. Mr. Johnson fears that another elevator outage could happen at any time or that an emergency could leave him stranded on the second floor.

162.    Additionally, Mr. Johnson was approved for a cell assistant in June 2019 because he needs assistance with cell cleaning, but he still has not received one. Because Mr. Johnson

requires assistance only with cell cleaning, and with moving cells when that is periodically required, his cell assistant would not need to be housed in the same cell with him, but Mr. Johnson has been told his block has no cell assistants. In fact, Mr. Johnson's neighbor in an adjoining cell has volunteered to help him clean, but a correction officer has refused to allow the assistance. As a result, the people who bring cleaning supplies to the block every Saturday regularly demand money to clean his cell for him.

E. *Khalik Jones*

163.    Mr. Jones' nerve damage in his right arm and wrist, and degenerative spine condition cause him radiating pain in his extremities, limiting his ability to carry objects, stand, and walk. He has also experienced seizures. In 2016, before he was incarcerated, he started using a cane to help him stabilize his gait and prevent falls.

164.    Mr. Jones was provided a cane in county jail in 2017 based on the recommendation of an outside physical therapist who evaluated him. Mr. Jones used that jail-issued cane at two other DOCCS facilities and for his first few months at Five Points, where he arrived in December 2018.

165.    However, on July 24, 2019, DOCCS' medical staff at Five Points arbitrarily and without any medical basis seized Mr. Jones' cane. Notwithstanding medical records from outside consultations a month earlier with a neurophysiology clinic, confirming Mr. Jones' chronic neuropathy, the medical provider at Five Points, Nurse Practitioner Salotti, ordered Mr. Jones to walk without the cane, and when he responded that he could not, filed a misbehavior report accusing him of lying about his various disabilities and disobeying a direct order. A disciplinary hearing later dismissed all the charges, stating "Physical evidence, that of witnesses, along with the testimony of all the witnesses confirm that Inmate Jones does have several disabilities that which consist of a speech impediment and walking with a longated gate [sic]."

166.     Without his cane, Mr. Jones struggled to ambulate around Five Points, particularly after Defendants moved him to a cell on a gallery floor (second floor, upstairs) and arbitrarily denied him an elevator pass, forcing Mr. Jones to dangerously and painstakingly climb up and down stairs to get to and from the law library, call-outs, and every other activity. On August 16, 2019, Mr. Jones fell down the stairs and was taken to the medical unit with injuries. Nurse Practitioner Salotti again issued him a misbehavior report for charges including lying and faking the fall. A disciplinary hearing dismissed all those charges as well. It took more than a full year—until November 2020—for Mr. Jones to be reassigned to a ground-floor cell.

167.     Later in August 2019, Mr. Jones was temporarily transferred to Downstate Correctional Facility to attend a court appearance. While there, his mobility disability and need for a "flat facility" were noted in his file, and he was reissued a cane. Yet the day he returned to Five Points, on or around September 26, 2019, Nurse Practitioner Salotti, without examining him, immediately confiscated the new cane. At the same time, and also without examining him, she restricted his wrist brace authorization to be for in-cell use only, reiterated his elevator pass denial, denied him a feed-in permit to eat meals inside his cell, and discontinued his asthma inhalers. His current wrist brace is in tatters and has not been replaced in nearly two years.

168.     Defendants have continued to deny Mr. Jones a new wrist brace and the use of a cane despite his repeated requests, documented falls, and ongoing complaints of pain and difficulty getting around the facility.

169.     Without his cane, Mr. Jones has experienced multiple additional falls, including many inside his cell.  On August 2, 2020, Mr. Jones fell while in the law library, bruising his head and injuring his tailbone. Afterwards, Nurse Practitioner Salotti warned that she would have

issued him another misbehavior report in response to the fall if a correction officer had not witnessed him hitting the back of his head.

170.    Most recently, he fell on July 4, 2021, while moving to a new cell, sustaining additional injuries.

171.    In general, walking unaided is excruciatingly painful for Mr. Jones, and he can walk only extremely slowly. Indeed, despite the medical staff's denial of a feed-in permit as a reasonable accommodation for Mr. Jones' disabilities, the security staff at Five Points has issued him the same permit based on safety concerns about how far he lags behind his company when walking to the mess hall.

172.    As a result of the pain he experiences traveling around the facility without accommodations, as well as the harassment he routinely suffers from correction officers and other individuals based on his speech and mobility disabilities, Mr. Jones avoids leaving his cell as much as possible.

173.    Still, he makes every effort to attend his mental health therapy appointments each month; however, he cannot access the full benefit of his scheduled sessions because it takes him around 25 minutes to walk unaided to the medical unit from his cell. Occasionally, a correction officer will let Mr. Jones leave his cell a little early to allow him extra time for the walk, but even so he arrives late for his appointment. Consistently, by the time he reaches the medical unit, he has been skipped over and must wait until the mental health providers can finish seeing other scheduled patients and come back around to him. As a result, his time with them is cut short and he typically only spends around 10-15 minutes with a provider.

174.    Five Points' failure to accommodate Mr. Jones' disabilities means that he also is routinely delayed in traveling to and from the law library, call-outs, commissary, and other

activities.  Mr. Jones has a long walk to the law library that takes him fifteen minutes or more each way without a cane.

175.    Additionally, because Defendants have unreasonably denied Mr. Jones' requests for assistance with carrying items as an accommodation for his wrist injury, nerve pain, and unbalanced gait, he is forced to pay other individuals to transport his belongings when needed, such as retrieving purchases from commissary.

176.    By failing to provide Mr. Jones a cane and related accommodations, Defendants deny Mr. Jones the self-sufficiency and independence that non-disabled people incarcerated at Five Points enjoy.

## CLASS ACTION ALLEGATIONS

177.    Plaintiffs bring this action individually and on behalf of all persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

178.    The class consists of all people with mobility disabilities who are currently detained or who will be detained at Five Points, where "mobility disabilities" is defined to include any physical impairment that substantially limits the major life activities of walking or standing, consistent with the ADA and Section 504.

179.    The persons in the class are so numerous that joinder of all such persons is impracticable, and the disposition of their claims in a class action is a benefit to the parties and to the Court.

180.    This is a fluid class because the population within DOCCS facilities changes frequently and not all class members can be specifically identified.

181.    There are questions of law and fact common to the class. All individuals are subject to the same conditions and policies, the legality of which will be determined under the ADA and Section 504.

182.     The claims of the Plaintiffs are typical of the claims of the class. Plaintiffs have been and are being denied their legal right to services, programs, and activities at Five Points.

183.     Plaintiffs will fairly and adequately protect the interests of the class. There are no conflicts between the Plaintiffs and other class members. Plaintiffs have retained counsel experienced in class action litigation relating to prisoners' rights and the civil rights of persons with disabilities.

184.     Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole, by employing policies, practices, and procedures that:

a.   Fail to adequately identify, track, and timely provide individualized accommodations to people with disabilities;

b.   Arbitrarily confiscate and deny mobility aids and other accommodations to people with disabilities; and

c.   Not only fail to provide motorized wheelchairs to enable people with disabilities to independently access the programs and services they are entitled to, but fail even to ensure a minimally adequate mobility assistance program that enables people with disabilities to use the bathroom and reach all relevant programs, services, and activities, such as meals, recreation, medical and dental services, call-outs, commissary, the law library, and socialization.

## **CAUSES OF ACTION**

### **COUNT I**
Violation of the Americans with Disabilities Act
(42 U.S.C. § 12101, et seq.)

185.     Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

186.    Title II of the ADA states, in pertinent part:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity.

42 U.S.C. § 12132.

187.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

188.    DOCCS is a public entity within the meaning of Title II of the ADA.

189.    Defendants provided and provide "services, programs [and] activities" including (1) physical facilities where such programs, services or activities are held, including medical, dental, mental health, meals, housing, the law library, commissary, and recreation facilities; (2) administrative processes including identification, assessment, classification, and meaningful accommodation and grievance processes; (3) other formal and informal programs including rehabilitation and educational programs, telephone services, entertainment, bathing and toileting, and socialization; and (4)  many other programs and services typical of a correctional facility.

190.    The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). A "'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

191.    Each of the named individual Plaintiffs, and all others similarly situated, were, at all times relevant to this action, and are currently "qualified individuals with disabilities" within the meaning of Title II of the ADA. They all have impairments that substantially limit the major life activities of standing, walking, and caring for oneself, and they all are incarcerated by

Defendants, and thus are qualified—with or without reasonable modification—to participate in the programs, services, and activities at Five Points.

192.    Congress directed the Department of Justice ("DOJ") to write regulations implementing Title II's prohibition against discrimination.  42 U.S.C. § 12134.  Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA.  28 C.F.R. § 35.101 *et seq.*  These regulations include regulations specific to adult detention and correctional facilities. 28 C.F.R. § 35.152.

193.    Title II of the ADA requires public entities, including Defendants, to operate each of their programs, services, or activities "so that, when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities."  28 C.F.R. § 35.150; *see also* 28 C.F.R. §§ 35.149, 35.151.

194.    By failing to provide necessary mobility aids and accommodations, such as an appropriate identification and accommodation process, properly fitted wheelchairs, in-cell access to mobility aids, cell assistants, reasonable modifications to policies and practices, and either motorized wheelchairs or an adequate pusher program, Defendants have failed to provide Plaintiffs and members of the putative class equal access to their programs and services, in violation of Title II of the ADA and its implementing regulations. *See* 42 U.S.C. § 12134; 28 C.F.R. § 35.101 *et seq*.

195.    By failing to ensure that people with disabilities at Five Points receive necessary accommodations such as mobility aids and a program that enables them to move about the facility, the services offered to people with disabilities at Five Points are not equal to or not as effective in affording equal opportunity as those offered to non-disabled people incarcerated at Five Points. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(ii).

196.    Defendants fail to provide Plaintiffs and members of the putative class with services that are as effective as those services available to their non-disabled peers, and thus deny people with disabilities equal opportunity: (1) to obtain the same result, (2) to gain the same benefit, and (3) to reach the same level of achievement as their non-disabled peers. Defendants employ policies, practices, and procedures that regularly leave people with disabilities without necessary mobility aids or cell assistants suited to their specific disability needs; Defendants arbitrarily deny and confiscate mobility aids; and Defendants fail to provide motorized wheelchairs to enable people with disabilities to independently access all relevant services and programs like meals, recreation, law library, medical services, and rehabilitation programs, but fail even to ensure a minimally adequate mobility assistance program that enables people with disabilities to use the bathroom or reach relevant programs, services, and activities. As such, the services offered at Five Points for people with disabilities are not sufficient to provide equal access to Defendants' programs and services for Plaintiffs and members of the putative class. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(iii).

197.    Defendants fail to make reasonable modifications to their policies, practices, and procedures even though these modifications are necessary to avoid discriminating against Plaintiffs and members of the putative class, in violation of 28 C.F.R. § 35.130(b)(7). Specifically, Defendants have failed to modify their policies regarding identifying people with disabilities, ensuring continuity of care and accommodations from facility to facility, providing accommodations appropriately tailored to individuals who need them in a timely way, permitting accommodations to its yard policy for people whose disabilities prevent them from complying with it, and requiring IMA pushers and cell assistants to be appropriately trained and available when needed by a person with a disability.

198.    Defendants use methods of administration that have the effect of subjecting Plaintiffs and members of the putative class to discrimination by reason of their disability because Defendants' policy and practice of failing to provide necessary accommodations effectively denies people with disabilities at Five Points the ability to access and benefit from Five Points programs and services. As such, these methods of administration also have the purpose and effect of defeating or substantially impairing accomplishment of the objectives of Defendants' program with respect to Plaintiffs and members of the putative class because these people with disabilities are denied equal access to the facility's programs, services, and activities. This conduct violates, among other provisions, 28 C.F.R. §§ 35.130(b)(3)(i) and (ii).

199.    By failing to provide necessary accommodations, such that people with disabilities routinely miss or face significant delays attending and returning from meals, recreation, rehabilitation programs, law library, and other programs that involve socialization with non-disabled people incarcerated at Five Points, Defendants fail to administer their services, programs, and activities in the most integrated setting appropriate to the needs of people with disabilities. 28 C.F.R. § 35.130(d).

200.    Defendants charge people with disabilities unlawful surcharges for reasonable accommodations, by charging individuals for properly fitted wheelchairs and mobility aids, in violation of 28 C.F.R. § 35.130(f).

201.    As a direct and proximate result of the aforementioned acts, Plaintiffs have been and continue to be injured and suffer irreparable harm.

202.    Defendants' conduct constitutes an ongoing and continuous violation of Title II of the ADA and, as a result, Plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, and reasonable attorneys' fees and costs.

## COUNT II
Violation of Section 504 of the Rehabilitation Act of 1973
(29 U.S.C. § 794)

203.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the

Complaint.

204.    Section 504 provides, in pertinent part:

No otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.] 29 U.S.C. § 794(a).

205.    Defendants were, at all times relevant to this action, and are currently recipients

of federal financial assistance within the meaning of Section 504, and Defendants provided and

provide a "program or activity" where "program or activity" is described as "all the operations

of" the recipient, which includes the programs and activities in Five Points Correctional Facility.

29 U.S.C. § 794(b).

206.    An "individual with a disability" is defined under the statute, in pertinent part, as

an "individual who has a physical or mental impairment that substantially limits one or more

major life activities of such individual."  29 U.S.C. § 705(2)(B) (referencing 42 U.S.C. § 12102).

207.    Plaintiffs and members of the putative class were, at all times relevant to this

action, and are currently "otherwise qualified individuals with disabilities" within the meaning of

Section 504. All members of the putative class have an impairment that substantially limits

major life activities of standing, walking, and caring for oneself. All are incarcerated at Five

Points and are qualified—with or without reasonable modification—to participate in Five Points'

programs and services.

208.    Defendants have violated the rights of Plaintiffs and members of the putative class

secured by Section 504 and its implementing regulations.

209.     As a direct and proximate result of the aforementioned acts, Plaintiffs have been and continue to be injured and suffer irreparable harm.

210.     Defendants' conduct constitutes an ongoing and continuous violation of Section 504 and, as a result, Plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually and on behalf of the class they represent, ask the Court to:

211.     Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

212.     Order and declare that Defendants' conduct as alleged herein has violated, and continues to violate, the ADA, 42 U.S.C. §§ 12101 et seq., and accompanying regulations, and Section 504, 29 U.S.C. § 794, and accompanying regulations.

213.     Preliminarily and permanently enjoin Defendants from violating the ADA, 42 U.S.C. §§ 12101 et seq., and accompanying regulations, and Section 504, 29 U.S.C. § 794, and accompanying regulations.

214.     Order Defendants to provide Plaintiffs and members of the Plaintiff Class meaningful access to services, programs, and activities at Five Points.

215.     Order the appointment of a monitor with expertise in the provision of disability-related accommodations in a correctional setting to oversee the implementation of the above-listed systems, processes, and mechanism, and grant the monitor authority to administer certain programs and activities of Defendants as may be necessary to ensure the non-discrimination of people with disabilities incarcerated at Five Points.

216.    Retain jurisdiction of this case until Defendants have complied with the orders of this Court, and there is reasonable assurance that Defendants will continue to comply in the future, absent continuing jurisdiction.

217.    Award Plaintiffs compensatory damages, as provided by statute and law;

218.    Award Plaintiffs attorneys' fees and costs, as provided by statute and law;

219.    Any other such relief as the Court finds just and proper.


Dated:  August 30, 2021
       New York, New York

Respectfully submitted,

DISABILITY RIGHTS ADVOCATES
Torie Atkinson
Chloe Holzman
655 Third Avenue, 14th Floor
New York, NY 10117-5621
Tel:  (212) 644-8644
Fax:  (212) 644-8636
tatkinson@dralegal.org
cholzman@dralegal.org


_____
Torie Atkinson


PRISONERS' LEGAL SERVICES OF NEW YORK
Megan Welch
Hallie Mitnick
Karen Murtagh, Executive Director
114 Prospect Street
Ithaca, NY 14850
Tel:  (607) 273-2283
Fax: (607) 272-9122
mwelch@plsy.org
hmitnick@plsny.org

Andrew Stecker
Karen Murtagh, Executive Director
14 Lafayette Square, Suite 510
Buffalo, New York 14203

Tel: (716) 854-1007
astecker@plsny.org

_____
Megan P. Welch

*Attorneys for Plaintiffs*